IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| USC IP PARTNERSHIP, L.P., | § | |
| | § | |
| Plaintiff, | § | Civil Action No. 2:20-cv-00555-ADA |
| | § | |
| v. | § | |
| | § | JURY DEMAND |
| FACEBOOK, INC., | § | |
| | § | |
| Defendant. | § | |
| | § | |
| | § | |
| | § | |

**MOTION FOR SUMMARY JUDGMENT OF INVALIDITY UNDER 35 USC § 101**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ......................................................................................... 1

II.     THE CLAIMS OF THE '300 PATENT ARE NOT PATENT ELIGIBLE...................... 1

A.      LEGAL STANDARD........................................................................... 1

B.      DESCRIPTION OF THE '300 PATENT ............................................. 2

    1.      OVERVIEW OF THE '300 PATENT SPECIFICATION ........................ 2

    2.      OVERVIEW OF THE CLAIMS OF THE '300 PATENT...................... 5

C.      ARGUMENT ...................................................................................... 9

    1.      STEP ONE: THE ASSERTED CLAIMS OF THE '300 PATENT
            ARE DIRECTED TO AN ABSTRACT IDEA ......................................... 9

    2.      STEP TWO: THE ASSERTED CLAIMS OF THE '300 PATENT
            DO NOT RECITE AN INVENTIVE CONCEPT ................................... 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affinity Labs of Tex., LLC v. Amazon.com, Inc.*,
    838 F.3d 1266 (Fed. Cir. 2016)........................................................................12, 16

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
    134 S. Ct. 2347 (2014) ............................................................................... *passim*

*Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*,
    967 F.3d 1285 (Fed. Cir. 2020)..............................................................................12

*Apple, Inc. v. Ameranth, Inc.*,
    842 F.3d 1229 (Fed. Cir. 2016)........................................................................10, 14

*Bridge and Post, Inc. v. Verizon Commc'ns, Inc.*,
    778 F. App'x 882 (Fed. Cir. 2019) ........................................................................12

*BSG Tech LLC v. Buyseasons, Inc.*,
    899 F.3d 1281 (Fed. Cir. 2018)....................................................................13, 14, 16

*ChargePoint, Inc. v. SemaConnect, Inc.*,
    920 F.3d 759 (Fed. Cir. 2019)...............................................................................13

*Customedia Techs., LLC v. Dish Network Corp.*,
    951 F.3d 1359 (Fed. Cir. 2020)..........................................................10, 11, 12, 14

*Dropbox, Inc. v. Synchronoss Techs., Inc.*,
    815 F. App'x 529 (Fed. Cir. 2020) ........................................................................15

*Elec. Power Grp., LLC v. Alstom S.A.*,
    830 F.3d 1350 (Fed. Cir. 2016)..................................................1, 10, 13, 14, 15

*Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*,
    955 F.3d 1317 (Fed. Cir. 2020)..............................................................................12

*Intell. Ventures I LLC v. Capital One Fin. Corp.*,
    850 F.3d 1332 (Fed. Cir. 2017)........................................................................10, 16

*Intell. Ventures I, LLC v. Captial One Bank (USA)*,
    792 F.3d 1363 (Fed. Cir. 2015)........................................................................11, 12

*Intell. Ventures I LLC v. Symantec Corp.*,
    838 F.3d 1307 (Fed. Cir. 2016)..............................................................................15

*RecogniCorp, LLC v. Nintendo Co.*,
    855 F.3d 1322 (Fed. Cir. 2017).................................................................................14

*SAP Am., Inc. v. InvestPic, LLC*,
    898 F.3d 1161 (Fed. Cir. 2018)..........................................................................11, 14

*Simio, LLC v. FlexSim Software Prods., Inc.*,
    983 F.3d 1353 (Fed. Cir. 2020).................................................................................10

*In re TLI Commc'ns Patent Litig.*,
    823 F.3d 607 (Fed. Cir. 2016)...................................................................................15

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
    874 F.3d 1329 (Fed. Cir. 2017).................................................................................15

*Ultramercial, Inc. v. Hulu, LLC*,
    772 F.3d 709 (Fed. Cir. 2014)...........................................................................10, 13

## I.      INTRODUCTION

The claims in the asserted patent in this case, U.S. Patent No. 8,645,300 (the "'300 patent"), are directed to an abstract idea, described by the patentee as "collecting, analyzing and using intent data." (Ex. 1 at 2:42-43.) People have used the same idea in the real world for generations when, for example, a person recommends a book to a student in a library or a salesperson recommends an item for purchase in a retail store. Indeed, the Federal Circuit has made clear that claims, like those in the '300 patent, that are directed to gathering, analyzing and displaying information are not patent eligible. *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353-54 (Fed. Cir. 2016).

The claims of the '300 patent fail the two-step *Alice* test under a long line of Federal Circuit precedent. At step one, the claims are directed to an abstract idea and only recite desired results, not an improvement to the functioning of a computer or any specific technological solution. The claims are not saved at step two because they only state open-ended functional aspirations using routine and conventional computing functionality to somehow "collect[], analyz[e] and us[e] intent data." (Ex. 1 at 2:42-43.)

Accordingly, Facebook respectfully requests that the Court enter summary judgment that all of the claims of the '300 patent are not patent eligible.

## II.      THE CLAIMS OF THE '300 PATENT ARE NOT PATENT ELIGIBLE

### A.      Legal Standard

The Supreme Court's decision in *Alice* articulated the now-familiar two-step test for determining eligibility under § 101. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014). At step one, the court determines whether the claims "are directed to a patent-ineligible concept," such as an abstract idea. *Id.* If the claims are directed to an abstract idea, then the court

proceeds to step two and looks to the elements of the claim "both individually and as an ordered combination" to determine whether there is an "inventive concept"—*i.e.*, an element or combination of elements that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice*, 134 S. Ct. at 2355 (citation omitted).

**B.     Description of the '300 Patent**

**1.     Overview of the '300 Patent Specification**

The '300 patent was filed in July 2011 and is titled "System and Method for Intent Data Processing." (Ex. 1.) The "Background of the Invention" acknowledges that websites had already become "valuable resources for companies to engage consumers and customers." (*Id.* at 1:11-12.) The Background notes it was "[p]aramount to the success of a website" to facilitate identification and navigation "to the pages within the website that contain the information or perform the functions that correspond to the visitor's intent." (*Id.* at 1:12-17.) Even Plaintiff's expert, Dr. Jennifer Golbeck, recognized that the alleged invention related to the age-old problem of gathering and analyzing information for presentation to a user because "[t]he ever-increasing volume of content and pages associated with websites can frustrate the ability of a user to identify and navigate to the pages within the website that contain the information or perform the functions that correspond to the visitor's intent." (Ex. 2, Golbeck Infringement Report ¶ 33.) The '300 patent attempts to address this perceived issue by purporting to disclose "improved systems and methods for determining a visitor's intent and for using the visitor's intent to predict and suggest webpages for the visitor." (Ex. 1 at 1:18-20.)

To address this purported solution, the patent discloses "[a] system for *collecting, analyzing and using intent data*." (Ex. 1 at 2:42-43 (emphasis added).) The patent defines the

2

term "intent" in a decidedly non-technical fashion – it simply refers to "a unique purpose or usage of the website." (*Id.* at 4:25.) The specification describes the disclosed system at a high level without any disclosure of any patent-eligible technology. In particular, as admitted by Plaintiff's technical expert, the patent does not disclose any specific way to analyze intent data. (*See* Ex. 3, Golbeck Depo. at 209:21-210:11 ("this description doesn't go on to then say how the … intent engine makes its calculations."); *id.* at 212:22-214:4 ("it's kind of ambiguous on how the inference is done.").) Figure 2, for example, depicts a flow chart for providing a "method for predicting visitor intent":



Figure 2

Figure 2 above shows step **103** of providing an "inferred intent" for display to a website visitor, after receiving and processing in input parameter from the web browser (steps **101-102**), but the specification does not disclose any technique for actually inferring the visitor's intent. In step **101**, the "input parameters," such as "a URL or similar webpage identity," are received to an "intent engine" "from the web browser of a visitor." (Ex. 1 at 3:38-41.) In one embodiment, the URL is simply used to perform a database "lookup" for intent candidates, which are then ranked in an undisclosed manner. (*Id.* at 4:60-67.) The visitor may also be provided the opportunity to

"indicate how well the webpage content matches the inferred intent."  (*Id*. at 5:51-52.)

The specification also provides a similarly high-level description of the process for recommending a webpage to the website visitor, as shown in Figure 3.



Figure 3

According to the specification, the visitor is "prompted to indicate an intent."  (*Id*. at 3:47-48.) Then the indicated intent is "received into the intent engine (step 202) and processed to determine on[e] or more web page recommendations," including by "us[ing] the indicated intent to reference to historical intent data provided by previous visitors to webpages of the namespace."  (*Id*. at 3:48-53; *see also id*. at 5:59-61 ("When the visitor first confirms their intent, they are presented with recommended links to the pages that are rated most highly for that intent.").)  Then the "web page recommendations may be provided to the visitor web browser (step 204) for display to the visitor" as "hyperlinks to the recommended web pages."  (*Id*. at 3:53-56.)

The patent makes clear that nothing more than routine and conventional computing equipment and programming is required to implement the claimed system.  The "system for collecting, analyzing and using intent data" is implemented using a generic "web server" providing

standard "web pages" to a user at a conventional "web browser."  (*Id*. at 2:43-46.)  The "intent

engine" is implemented on generic platforms including ".NET" (a standard Microsoft development

platform) or "cloud based infrastructure[]" platforms like "Google App Engine (GAE), Microsoft

Azure, Amazon EC2, Rackspace Cloud, etc."  (*Id*. at 3:11-14; *see also id*. at 3:14-15 ("Other

implementations will be apparent to a person skilled in the art.").)  The patent does not require any

particular "Intent Ranking Formula," as it may be implemented using "[v]arious ranking formulas"

of which "many standard formulas will be apparent to a person skilled in the art."  (*Id*. at 10:25-

27.)  With respect to the interactions between the "intent engine" and the web browser, the patent

makes clear that information can be conveyed using conventional communication media, including

any of an unspecified "plurality of protocols."  (*Id*. at 18:30-34.)  The patent does not limit its

application to computers and explains that its "capabilities may be performed … on, or via, any

device able to provide and/or receive information."  (*Id*. at 18:20-22.)

### 2.      Overview of the Claims of the '300 Patent

Plaintiff asserts all 17 claims of the '300 patent in this case.  Claims 1, 5 and 11 are

independent claims.  Representative claim 1 recites

1. A method for predicting an intent of a visitor to a webpage, the method
comprising:

receiving into an intent engine at least one input parameter from a web browser
displaying the webpage;

processing the at least one input parameter in the intent engine to determine at least
one inferred intent;

providing the at least one inferred intent to the web browser to cause the at least
one inferred intent to be displayed on the webpage;

prompting the visitor to confirm the visitor's intent;

receiving a confirmed intent into the intent engine;

5

processing the confirmed intent in the intent engine to determine at least one recommended webpage that matches the confirmed intent, the at least one recommended webpage selected from a plurality of webpages within a defined namespace;

causing the webpage in the web browser to display at least one link to the at least one recommended webpage;

prompting the visitor to rank the webpage for the inferred intent;

receiving a rank from the web browser; and

storing a datapoint comprising an identity of the webpage, the inferred intent and the received rank.

(*Id.*, claim 1.)

Dependent claims 2 and 3 add nothing of patentable significance, as they merely recite a particular input parameter and processing the input parameter (in an unspecified manner) to determine a ranked list of intents for the webpage.  (*Id.*, claims 2-3.)  Dependent claim 4 merely adds selecting and displaying the "highest ranked intent" in the web browser.  (*Id.*, claim 4.)

Independent claim 5 shares similarities with claim 1, but does not recite the process in step 1 of determining an "inferred intent."  And instead of reciting "prompting the visitor to confirm the visitor's intent," per claim 1, claim 5 recites "prompting the visitor to indicate an intent on a webpage," a distinction without legal significance for purposes of § 101.  The indicated intent is then used to recommend a webpage, display a link to the recommended webpage, similar to claim 1.  Claim 5 further adds that the indicated intent is used as a reference for "intent ranking data" for ranking webpages in the namespace.  (*Id.*, claim 5.).  Dependent claim 6 adds determining a ranked list of webpages of the namespace for the indicated intent.  (*Id.*, claim 6.)  Dependent claim 7 adds processing additional datapoints in an unspecified manner.  (*Id.*, claim 7.)  Dependent claim 8 adds inferring an intent and displaying it in the webpage displayed in the web browser.  (*Id.*, claim 8.)  Dependent claim 9 adds prompting the visitor to rank the webpage and store data about it in a

6

database.  (*Id.*, claim 9.)  Dependent claim 10 adds generating a ranked list of intents and displaying them in the webpage at the browser.  (*Id.*, claim 10.)

Independent claim 11 describes the same basic technique as claims 1 and 5, but from a user interface standpoint.  Claim 11 recites an engine that can display an "intent tool in at least one webpage" loaded in a web browser.  (*Id.*, claim 11.)  That intent tool includes "an intent field" to display "at least one intent," a "recommendation field" to display "at least one webpage recommendation," and a "ranking tool" to receive and store "ranking data."  (*Id.*, claim 11.)  Claim 11 does not provide any detail on how the recited "fields" and the "ranking tool" are implemented.

The claims depending from claim 11, as with the other dependent claims of the '300 patent, add nothing of patentable significance.  Most of these dependent claims, in fact, merely recite processes already required in independent claim 1.  For example, claim 12 adds receiving a page rank from the ranking tool and storing a generated datapoint about it.  (*Id.*, claim 12.)  Dependent claims 13 and 15 add limitations about processing datapoints to determine a ranked list of webpages.  (*Id.*, claims 13, 15.)  Dependent claim 14 recites receiving a confirmed intent, referencing a ranked list to select a recommendation, and then providing a link for the recommendation.  (*Id.*, claim 14.)  Dependent claim 16 recites storing information about the webpages of the namespace in a database. (*Id.*, claim 16.)  Finally, dependent claim 17 recites that the intent tool of claim 11 is a non-specific "configurable widget." (*Id.*, claim 17.)

Nothing in the claims of the '300 patent purports to provide an improvement to any underlying computer or technology.  This is apparent from the way in which the concept behind the claim can readily be analogized to real-world scenarios, such as a librarian identifying books for a student in a school library as shown in the table below:

| Claim 1 of the '300 Patent | Real-World Analogue |
|---|---|
| 1. A method for predicting an intent of a visitor to a webpage, the method comprising: | A librarian helps a student visiting a library identify books in the library. |
| receiving into an intent engine at least one input parameter from a web browser displaying the webpage; | The librarian (intent engine) is told by the student that the student is enrolled in a world history class (an input parameter). |
| processing the at least one input parameter in the intent engine to determine at least one inferred intent; | The librarian infers that the student is looking for a book about the Egyptian pyramids (because other students in the same class have asked for books about that subject). |
| providing the at least one inferred intent to the web browser to cause the at least one inferred intent to be displayed on the webpage; | The librarian shows the student a book about the pyramids (providing at least one inferred intent). |
| prompting the visitor to confirm the visitor's intent; | The librarian asks the student to confirm it, in fact, wants a book about the pyramids. |
| receiving a confirmed intent into the intent engine; | The student confirms "Yes. That's the subject I was looking for." |
| processing the confirmed intent in the intent engine to determine at least one recommended webpage that matches the confirmed intent, the at least one recommended webpage selected from a plurality of webpages within a defined namespace; | The librarian identifies at least one book recommendation about the pyramids (such as *The Secret of the Great Pyramid: How One Man's Obsession Led to the Solution of Ancient Egypt's Greatest Mystery*, by Bob Brier).  The book is stored on the shelves in the library (defined namespace). |
| causing the webpage in the web browser to display at least one link to the at least one recommended webpage; | The librarian gives the student the Dewey Decimal Number (link) for *The Secret of the Great Pyramid.* |

| Claim 1 of the '300 Patent | Real-World Analogue |
|---|---|
| prompting the visitor to rank the webpage for the inferred intent; | The librarian asks the student for feedback about how helpful the recommendations was (prompting the visitor to rank the webpage). |
| receiving a rank from the web browser; and | The student tells the librarian it was very helpful (receiving a rank). |
| storing a datapoint comprising an identity of the webpage, the inferred intent and the received rank. | The librarian takes a note about the recommendation including the librarian's initial inference, the name of the recommended book, the and the student's feedback (storing a datapoint). |

Beyond this, even the key embodiment provided in the patent is instructive.  The patent describes a system that infers that a visitor to Dell's website is looking for RAM upgrades based on, for example, the URL of the webpage the visitor is viewing.  (Ex. 1 at 4:60-5:5, 6:19-20.)  After the visitor confirms their intent, the system suggests various webpages for specific RAM upgrade to purchase, and the visitor can rank the webpage for the intent.  (Ex. 1 at 6:19-48.)  These same acts may easily be accomplished offline.  A shopper may, for example, be looking at RAM upgrades in an electronics store, whereby a sales associate infers that the shopper is looking for RAM upgrades.  After the shopper confirms this is their intent, the sales associate may suggest various top rated RAM upgrades, and a user can provide feedback on their shopping experience to the sales associate.

### C.     Argument

#### 1.     Step One: The Asserted Claims of the '300 Patent Are Directed to an Abstract Idea

At step one, the court considers "what the patent asserts to be the focus of the claimed advance over the prior art" to "determine whether the claim's character as a whole is directed to

ineligible subject matter." *Simio, LLC v. FlexSim Software Prods., Inc.*, 983 F.3d 1353, 1359 (Fed. Cir. 2020) (internal quotation marks and citations omitted).  For computer-related claims, like the claims of the '300 patent, the court must determine whether the claims focus on a "specific means or method that improves the relevant technology," which may pass muster under § 101, or on a "result or effect that itself is the abstract idea and merely invoke[s] generic processes and machinery," which does not.  *Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1241 (Fed. Cir. 2016) (citations omitted).  Claims that are "directed to a patent-eligible improvement to computer functionality… must be directed to *an improvement to the functionality of the computer or network platform itself*."  *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1365 (Fed. Cir. 2020) (emphasis added).

The Federal Circuit has confirmed that an abstract idea can be described at multiple levels of abstraction.  *See Ameranth*, 842 F.3d at 1240-41 ("An abstract idea can generally be described at different levels of abstraction.").  Consistent with this precedent, the Federal Circuit has found patents unpatentable based on abstract ideas described at various levels of abstraction.  For example, at a higher level of abstraction, the Federal Circuit has found unpatentable claims directed to abstract ideas such as "gathering and analyzing information of a specified content, then displaying the results," *Elec. Power*, 830 F.3d at 1354, or "collecting, displaying, and manipulating data."  *Intell. Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1341 (Fed. Cir. 2017) ("*Capital One II*").  On the other end of the spectrum, the Federal Circuit has confirmed the unpatentability of claims using a more granular statement of the abstraction, such as the eleven-step abstraction in *Ultramercial*.  *See Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 714-15 (Fed. Cir. 2014) ("An examination of the claim limitations of the [] patent shows that claim 1 includes eleven steps for displaying an advertisement in exchange for access to copyrighted media. . . . .

[t]his ordered combination of steps recites an abstraction—an idea, having no particular or concrete or tangible form.").

The claims of the '300 patent are clearly directed to an abstract idea because they only recite high-level desired functional results using conventional hardware and undisclosed software programming.  At a high level, the claims are directed to an abstract idea nearly identical to the *Electric Power* abstraction, as the patent itself describes the purpose of the claimed system as the abstract idea of "collecting, analyzing and using intent data."  (Ex. 1 at 2:42-43.)  At the next level of abstraction, the abstract idea can be described as providing recommended information to a visitor based on his or her current intent, *i.e.* its unique purpose or usage of the visit – a concept indistinguishable from other ideas deemed abstract by the Federal Circuit such as "customizing information based on (1) information known about the user and (2) navigation data."  *Intell. Ventures I, LLC v. Captial One Bank (USA)*, 792 F.3d 1363, 1369 (Fed. Cir. 2015) ("*Capital One I*").

Regardless of the level of abstraction applied to the claims, the claims here are squarely within the category of claims "that do not focus on an improvement in computers as tools, but on certain independently abstract ideas that use computers as tools."  *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1168 (Fed. Cir. 2018) (internal quotation marks and citation omitted).  The claims only recite high-level functional results:  input is received, processed to determine a result that is provided to the user (a recommended webpage), and the user is asked to provide feedback (a ranking).  The asserted claims here "do not enable computers to operate more quickly or efficiently, nor do they solve any technological problem."  *Customedia*, 951 F.3d at 1365.  They instead purport to address the age-old – and entirely *human* – problem of enabling the user to more easily locate "information or perform the functions that correspond to the visitor's intent."  ('300,

1:15-17.)  The ability to locate information corresponding to the person's intent is an age-old problem not limited to computers, and has been addressed in the paper-based world through libraries, filing systems, and other forms of categorization and organization.  And even within the domain of the World Wide Web, as Plaintiff's technical expert confirmed, this was a problem that existed long before the '300 patent, and a problem that exists to this day.  (Ex. 3, Golbeck Tr. at 18:6-19:4.)  The claims, in other words, do not address a technological problem – they address a human problem that happens to also occur when humans use computers as tools to locate and retrieve information.

It should come as no surprise that the claims' "essentially result-focused, functional" language fails to provide "the specificity required to transform [the] claim from one claiming only a result to one claiming a way of achieving it."  *Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*, 967 F.3d 1285, 1296-97 (Fed. Cir. 2020) (citation omitted).  The '300 patent "merely claims" the recited "functions in general terms, without limiting them to technical means for performing the functions that are arguably an advance," rendering the claims ineligible at step one.  *Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1328 (Fed. Cir. 2020) (citation omitted).

The asserted claims of the '300 patent are also analogous to claims in numerous previous cases found to be directed to abstract ideas, including:  (1) "customizing information based on [] information known about the user and [] navigation data," *Capital One I*, 792 F.3d at 1369; (2) "using a computer to deliver targeted advertising to a user," *Customedia*, 951 F.3d at 1362-63; (3) "tracking a user's computer network activity and using information gained about the user to deliver targeted media, such as advertisements," *Bridge and Post, Inc. v. Verizon Commc'ns, Inc.*, 778 F. App'x 882, 884-85 (Fed. Cir. 2019); (4) "delivering user-selected media content to portable devices," *Affinity Labs of Tex., LLC v. Amazon.com, Inc.*, 838 F.3d 1266, 1267-69 (Fed. Cir. 2016);

(5) "having users consider historical usage information while inputting data," *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1288 (Fed. Cir. 2018); (6) "displaying an advertisement in exchange for access to copyrighted media," *Ultramercial*, 772 F.3d at 714-15; and (7) "gathering and analyzing information of a specified content, then displaying the results," *Elec. Power*, 830 F.3d at 1354.

The specification further confirms that the '300 patent is directed to an abstract idea, not a concrete improvement to computer functionality. *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 767 (Fed. Cir. 2019) ("While the § 101 inquiry must focus on the language of the Asserted Claims themselves," the specification may be useful "to understand the problem facing the inventor, and ultimately, what the patent describes as the invention.") (internal quotation marks and citations omitted).  Indeed, as discussed above, one version of the abstract idea comes directly from the patentees' description of their invention as a "system for collecting, analyzing and using intent data." (Ex. 1 at 2:42-43.)  Moreover, the system is merely implemented using routine and conventional "web server[s]" serving "web pages" to standard "web browser[s]."  (*Id.* at 2:43-46.) The intent engine is implemented using generic cloud platforms from well-known vendors like Google, Microsoft and Amazon.  (*Id.* at 3:11-14.)  And as admitted by Plaintiff's expert, the patent specification is effectively silent on the details of how the intent engine calculates intents, determines rankings or what information is used in the intent engine.  (*See* Ex. 3, Golbeck Tr. at 209:21-210:11.)  Indeed, the patentees did not even limit their invention to computers, noting that it could be implemented on "any device able to provide and/or receive information."  (Ex. 1 at 18:20-23.)

None of the dependent claims changes the conclusion that the claims are directed to abstract ideas.  They each recite additional ideas for receiving, processing, displaying and/or storing intent

information, but "information as such is an intangible, hence abstract." *SAP*, 898 F.3d at 1167 (citation omitted).  "As many cases make clear, even if a process of collecting and analyzing information is 'limited to particular content' or a particular 'source,' that limitation does not make the collection and analysis other than abstract." *Id.* at 1168 (quoting *Elec. Power*, 830 F.3d at 1353).

Moreover, the claims do not solve an Internet-specific problem with an Internet-specific solution.  While the claims refer to generic well-known "web pages" and "web browsers," the idea of collecting, analyzing and using intent data commonly arises in everyday life, as illustrated in the example above of the librarian helping the student find a book on Egyptian history.  The claims of the '300 patent provide nothing more than instructions to perform the abstract idea and "do it on a computer."  *Ameranth*, 842 F.3d at 1243 (citation omitted).  In addition, the claims do not provide a "purported improvement in user experience," as they just recite generic web page functionality like "widgets" or "tools" that can be implemented in any variety of ways based on the knowledge of a person of ordinary skill in the art.  (Ex.1 at 6:19-7:13.)  Without more specificity it is not "sufficient to render the claims directed to an improvement in computer functionality." *Customedia*, 951 F.3d at 1365.

For these reasons, the claims of the '300 patent fail step one of *Alice*.

### 2. Step Two: The Asserted Claims of the '300 Patent Do Not Recite an Inventive Concept

The asserted claims also fail to recite an inventive concept that would confer patent-eligibility.  "To save a patent at step two, an inventive concept must be evident in the claims." *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017).  The inventive concept must provide "significantly more" than the abstract idea itself.  *BSG Tech*, 899 F.3d at 1289-90. "Well understood, routine, conventional" or "purely functional" claim elements cannot confer

patent-eligibility.  *Alice*, 134 S. Ct. at 2359-60; *In re TLI Commc'ns Patent Litig.*, 823 F.3d 607, 611-12 (Fed. Cir. 2016).

The asserted claims of the '300 patent recite nothing more than "generic functional language to achieve the[] purported solutions."  *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1339 (Fed. Cir. 2017).   The claims only state open-ended functional aspirations that, using routine and conventional computing functionality, somehow "collect[], analyz[e] and us[e] intent data."   "Nothing in the claims, understood in light of the specification, requires anything other than off-the-shelf, conventional computer, network, and display technology for gathering, sending, and presenting the desired information."  *Elec. Power*, 830 F.3d at 1355; *see also Intell. Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1316 (Fed. Cir. 2016) (claims are invalid at step two for failing to recite any "specific or limiting recitation of . . . improved computer technology.") (citation omitted).

The claims recite generic and well-known "web pages," "web browsers" and "databases" that were well known in the prior art long before the filing of the '300 patent in 2011.  (Ex. 4, Polish Invalidity Report ¶¶ 1877-1878.)  The "intent engine", which the Court construed as "a software component for collecting and analyzing intent data from visitors," cannot provide the inventive concept, as it is a purely functional "black box" implemented using standard cloud platforms from well-known vendors like Google, Microsoft and Amazon, not any inventive, new technology.  *In re TLI*, 823 F.3d at 612 (claims failed step two where "[t]he specification fails to provide any technical details for the tangible components, but instead predominately describes the system and methods in purely functional terms."); *Dropbox, Inc. v. Synchronoss Techs., Inc.*, 815 F. App'x 529, 532-33 (Fed. Cir. 2020) (affirming claimed advance over prior art was a "functional abstraction" where the specification treated an element of the claimed invention as a "black box").

15

Likewise, the "intent tool", "ranking tool" or "widget" do not provide any inventive concept because it is a standard web browser functionality that "a person skilled in the art will recognize that multiple configurations are possible." (Ex. 1 at 6:19-7:13.) "At that level of generality, the claims do no more than describe a desired function or outcome, without providing any limiting detail that confines the claim to a particular solution to an identified problem." *Affinity Labs*, 838 F.3d at 1269.

Considering each claim as an "ordered combination" of elements does not reveal any inventive concept that is "significantly more" than the abstract idea and would be sufficient to "transform the nature of the claim" into a patent-eligible improvement to an underlying technology. *BSG Tech*, 899 F.3d at 1289-90. Here, the claim merely reflects a sequence performed in a logical order dictated by the abstract idea. (Ex. 4, Polish Invalidity Report ¶ 1883.) For example, Claim 1 recites receiving and processing an "input parameter" into an "intent engine," which then provides an inferred intent in an unspecified manner. Then feedback about the intent is processed (again in a non-specific manner) to provide a recommendation, which is then stored. Claims 5 and 11 recite similar high-level concepts of receiving intent data, processing it, and then providing recommendations. Plaintiff cannot identify anything unusual or non-conventional about the particular order or sequence they recite (Ex. 5, Golbeck Invalidity Report ¶ 381.) As noted in Part **II.B.2**, nothing in the dependent claims adds anything of patentable significance, or confers any inventive concept.

In summary, whether "taken individually or in combination, the recited limitations neither improve the functions of the computer itself, nor provide specific programming, tailored software, or meaningful guidance for implementing the abstract concept." *Capital One II*, 850

16

F.3d at 1342.  Thus, the claims of the '300 patent fail step two of *Alice* and should be found

unpatentable.

 Dated:  October 5, 2021

/s/ Heidi L. Keefe

Heidi L. Keefe
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
Telephone:    (650) 843-5000
Fax:              (650) 849-7400
hkeefe@cooley.com

Phillip E. Morton (admitted *pro hac vice*)
COOLEY LLP
1299 Pennsylvania Avenue NW, Suite 700
Washington, DC 20004
Telephone:    (202) 842-7800
Fax:              (202) 842-7899
pmorton@cooley.com

Deron Dacus
Texas Bar No. 00790553
THE DACUS FIRM
821 ESE Loop 323, Suite 430
Tyler, TX 75701
Telephone:    (903) 705-1117
Fax:              (903) 581-2543
ddacus@dacusfirm.com

*Attorneys for Defendant Facebook, Inc.*

## **CERTIFICATE OF SERVICE**

Pursuant to the Federal Rules of Civil Procedure and Local Rule CV-5, I hereby certify that, on October 5, 2021, all counsel of record who have appeared in this case are being served with a copy of the foregoing via the Court's CM/ECF system.

*/s/ Heidi L. Keefe*
Heidi L. Keefe